**Electronically Filed**
**Intermediate Court of Appeals**
**CAAP-16-0000797**
**31-MAY-2019**
**10:59 AM**

NO. CAAP-16-0000797

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

STATE OF HAWAI'I, Plaintiff-Appellant, v.
JOSHUA LEE, Defendant-Appellee

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CR. NO. 15-1-1959)

MEMORANDUM OPINION
(By:  Ginoza, Chief Judge, Fujise and Chan, JJ.)

Plaintiff-Appellant State of Hawai'i (State) appeals from the Circuit Court of the First Circuit's (Circuit Court)[1] October 13, 2016 "Findings of Fact [FOF] and Conclusions of Law [COL] and Order Granting Defendant's Motion to Suppress Evidence and Statements" (Order).

On appeal, the State contends the Circuit Court erred in suppressing evidence stemming from the police entry into Defendant-Appellee Joshua Lee's (Lee) bedroom without a warrant where they were investigating a report that he was attempting to commit suicide.

I.

A.    **Factual Background**

On October 26, 2015, Honolulu Police Department (HPD) officers Sergeant Michael Cobb (Sergeant Cobb), Corporal Craig Takahashi (Corporal Takahashi), and Officer Summer Kahao (Officer Kahao) were dispatched on a "suicidal male call" to Lee's

---

[1]    The Honorable Rom A. Trader presided.

residence.  Lee's mother Linda Matsuo (Linda) and brother Gavan Lee (Gavan) were also present.  The following facts, as found by the Circuit Court, are, with one noted exception, undisputed by the State:

7.  Officer Kahao and Corporal Takahashi responded to Defendant's residence located at 98-569 Aloalii Street on a "suicidal male call."

8.  It was related through HPD dispatch that a male had locked himself in his bedroom, was threatening suicide and had samurai swords in the room.

9.  Corporal Takahashi arrived at 98-569 Aloalii Street approximately 1:30 p.m. and Officer Kahao arrived a few minutes later. Corporal Takahashi waited for Officer Kahao to arrive before entering the residence. When Corporal Takahashi and Officer Kahao arrived, they were greeted by a male who they believed to be Defendant's brother.  The male led Corporal Takahashi and Officer Kahao into the residence.  Corporal Takahashi and Officer Kahao had consent to enter the residence of 98-569 Aloalii Street.

10.  Once entering the residence, both Officer Kahao and Corporal Takahashi met with Defendant's mother, "Linda," who explained the circumstances to the officers.  Linda was in the upstairs kitchen, approximately 10 to 15 feet away from Defendant's bedroom door.  Officer Kahao began communicating with Defendant through the bedroom door and called out to him, "Joshua, this is Officer Kahao.  Could you please open the door?"  Defendant told the officers to go away, and that he did not want to talk to anyone. Defendant did not want to engage with the officers.

11.  Officer Kahao spoke to Defendant through his bedroom door for approximately 10 minutes.  Officer Kahao spoke to Defendant in a calm voice, trying to establish a rapport with him. Defendant repeatedly told Officer Kahao, "I'm okay.  I just don't want to talk to you," "I'm not hurt, just leave."

12.  Officer Kahao did not hear any signs of distress coming from inside the room.  It did not sound like Defendant was in pain or injured.

13.  Officer Kahao and Corporal Takahashi's goal was to visibly see that Defendant was okay.  Officer Kahao also wanted to speak to Defendant to see whether or not he was suicidal.  While Officer Kahao was speaking to Defendant, Corporal Takahashi also spoke to Defendant through the door and explained, "We just want to see you."

14.  After Officer Kahao had been attempting to speak to Defendant through his bedroom door for approximately 10 minutes Sergeant Cobb arrived at the residence. Defendant's brother, Gavan Lee ("Gavan"), met Sergeant Cobb at the front door and led him up to Defendant's bedroom door.  Sergeant Cobb had consent to enter 98-569 Aloalii Street.

15. When Sergeant Cobb arrived, he spoke to Defendant's mother ("Linda") who related that Defendant had tried to commit suicide before. Linda did not indicate when the prior suicide attempt may have occurred.

16. When Sergeant Cobb arrived, he took over speaking to Defendant through the bedroom door. Sergeant Cobb was more demanding, and a little bit louder than Officer Kahao. Sergeant Cobb told Defendant that he needed to open the door, that "he needed to grow up," and that "he needed to be a man." Sergeant Cobb told Defendant that if he did not open the door, they would break the door down. Defendant asked Sergeant Cobb, "Do you have a warrant?" Sergeant Cobb responded, "We don't need a warrant, dumbass."

17. None of the HPD personnel heard signs of injury, distress or any other indication that Defendant was hurt or harming himself. All of the officers confirmed that if there was any indication that Defendant was harming himself, they would have broken the bedroom door down.

18. After Sergeant Cobb had been talking to Defendant for approximately 10 minutes he noticed that Defendant's bedroom door could be unlocked from the outside by sticking a "pin or some type of small item into it." Sergeant Cobb asked Linda for something he could use to open the door. Linda gave Sergeant Cobb a paperclip.

19. Sergeant Cobb was successful at unlocking the door from the outside by using the paperclip, however, someone or something on the inside of Defendant's room was preventing Sergeant Cobb from opening the door.

20. Eventually, Defendant opened his bedroom door approximately four to six inches. All three officers could see parts of Defendant's person/body, but they could not see his entire body. From what the officers could see, Defendant did not appear to be injured. The officers also observed what appeared to be the handle to a samurai sword in Defendant's right hand. When Officer Kahao observed the handle, she put her hand on her firearm but did not draw it. When the door opened wider, the officers could see Defendant's full body. The officers could see that Defendant was not injured, in pain or hurt. Officer Kahao and Corporal Takahashi also observed that Defendant was holding a wooden sword in his right hand. When Officer Kahao observed that the sword Defendant was holding was a wooden sword, she took her hand off her firearm.

21. The officers observed that Defendant was holding a wooden sword, not a real samurai sword, before they entered Defendant's bedroom.

22. It is not a crime to possess wooden or real samurai swords in a bedroom.

23. The officers did not observe any illegal items or paraphernalia in Defendant's bedroom prior to entering. There was no information known to the officers before entering Defendant's bedroom that criminal activity was occurring within the bedroom.[2]

24. Defendant's home at 98-569 Aloalii Street has four bedrooms: one bedroom was converted into a sewing room; one bedroom belonged to Gavan; one bedroom belonged to Linda; and the third bedroom belonged to Defendant.

25. Defendant was locked in his bedroom.

26. Gavan was not allowed in his bedroom. Linda was not allowed in Defendant's bedroom without his consent.

27. There were times when Linda or a house cleaner would enter Defendant's bedroom however, it was with Defendant's consent.

28. None of the officers had obtained a warrant for 98-569 Aloalii Street or Defendant's bedroom prior to entering Defendant's bedroom.

The Circuit Court did not make any findings regarding the events that occurred after Lee's bedroom door was opened. However, the court also heard the following testimony regarding those events:

Corporal Takahashi testified that he responded to dispatch who reported an argument, which turned into a male who locked himself in a room and who had threatened suicide and had samurai swords in the room. He was the first officer on the scene and spoke to Lee's mother who told him Lee "had depression" and had tried to commit suicide before and hurt himself before. Corporal Takahashi was behind the other officers when Lee opened the door. When he moved closer he saw a wooden stick raised up at a ninety degree angle in Lee's hand. Sergeant Cobb tried to grab the stick and Lee flipped Sergeant Cobb to the floor. After wrestling with Lee, Officer Kahao and Corporal Takahashi sprayed Lee with pepper spray. The officers then backed out of the room but maintained visual contact with Lee.

Officer Kahao testified that she took the call seriously because she believed "that suicide was probable at that time." As the door was cracked open, she saw what she initially thought was a samurai sword and reached for her handgun before

_____

[2] The State challenges this FOF as clearly erroneous. However, as will be seen, this finding is not relevant to our analysis.

4

realizing it was a wooden sword. Lee was holding the sword up in a way "he would have used it to strike[,]" and she told him to drop the sword. Meanwhile, after Sergeant Cobb pushed his way into the room, Officer Kahao saw Sergeant Cobb flip onto the floor, but she was not sure what happened to the sword. Following Sergeant Cobb into the room, Officer Kahao saw Lee bending over Sergeant Cobb, and she attempted to place Lee in a hold but was thrown to the couch. Officer Kahao then sprayed Lee with pepper spray.

Sergeant Cobb testified that when he arrived at Lee's residence, he spoke with Lee's mother, who was a little bit "frantic," and said Lee had fought with his brother, "and now he wants to commit suicide. And, you know, she's worried – she said she's worried because he's done this before and he's actually cut himself[.]" Sergeant Cobb asked for, and Lee's mother produced a paper clip which Sergeant Cobb used to unlock the bedroom door. However, something on the other side of the door prevented Sergeant Cobb from opening the door.

Eventually, Lee cracked the door open about four to six inches and although Lee tried to hide it behind the door jamb, Sergeant Cobb saw the handle of what he believed could have been a samurai sword. Fearing for the officers' safety, Sergeant Cobb moved to grab the sword, pushing the door open, and shoving Lee in the process. Lee took a swing at Sergeant Cobb with the wooden samurai sword and Sergeant Cobb placed his hand on his gun. Lee then said in an agitated voice, "Shoot me. Shoot me. That's what I want." As Sergeant Cobb talked to Lee, trying to calm him down, Lee reached for metal samurai swords that were on the couch causing Sergeant Cobb to grab for Lee's left hand. Lee raised the wooden sword in a threatening manner and Sergeant Cobb pushed him back and away from the real swords. As Sergeant Cobb was pushing Lee back, Lee ducked down and flipped Sergeant Cobb over, and the officer landed partially on the bed. When Sergeant Cobb was on the floor, Lee kneed him twice in the head. The other officers attempted to subdue Lee physically but both used pepper spray when their efforts failed.

Gavan testified the door was opened and officers entered Lee's room. Gavan moved up and could see Lee was holding the wooden sword with the tip down. Gavan did not see Lee swing the sword. Police told Lee to drop the stick for a couple of minutes. Lee dropped the wooden sword when Sergeant Cobb grabbed his left arm and reached for his neck. On cross, Gavan acknowledged that Lee threw Sergeant Cobb on the floor.

B.   **Procedural History**

On December 15, 2015, Lee was charged with Terroristic Threatening in the First Degree, in violation of Hawaii Revised Statutes (HRS) § 707-716(1)(c) and/or (e)[3] (2014), Assault Against a Law Enforcement Officer in the First Degree, in violation of HRS § 707-712.5(1)[4] (2014), and Resisting Arrest, in

---

[3]    HRS § 707-716 provides, in relevant part:

**Terroristic threatening in the first degree.** (1) A person commits the offense of terroristic threatening in the first degree if the person commits terroristic threatening:

   . . . .

   (c)   Against a public servant arising out of the performance of the public servant's official duties. . . .

   . . . .

   (e)   With the use of a dangerous instrument or a simulated firearm. . . .

HRS § 707-715 (2014) provides, in pertinent part,

**Terroristic threatening, defined.** A person commits the offense of terroristic threatening if the person threatens, by word or conduct, to cause bodily injury to another person or serious damage or harm to property, including the pets or livestock, of another or to commit a felony:

   (1)   With the intent to terrorize, or in reckless disregard of the risk of terrorizing, another person[.]

HRS § 707-700 (2014) defines "Dangerous Instrument" as "any firearm, whether loaded or not, and whether operable or not, or other weapon, device, instrument, material, or substance, whether animate or inanimate, which in the manner it is used or is intended to be used is known to be capable of producing death or serious bodily injury."

[4]    § 707-712.5 provides, in relevant part:

**Assault against a law enforcement officer in the first degree.** (1) A person commits the offense of assault against a law enforcement officer in the first degree if the person:

(continued...)

6

violation of HRS § 710-1026(1)(a)[5] (2014).

On April 25, 2016, Lee moved to suppress the evidence and statements. Lee argued the police made warrantless entry into a place in which he had a reasonable expectation of privacy. Lee further argued that no exception to the warrant requirement applied because Linda's consent to enter was either ineffective and/or withdrawn, Lee only consented to entry under coercive threat, and there were no exigent circumstances justifying entry. On May 27, 2016, the State opposed, arguing that there were exigent circumstances and/or Lee consented to the search by opening the door, and pursuant to those exceptions evidence of Lee's criminal conduct toward officers was in plain view. The court heard the motion over three days on July 5, 2015, August 23, 2016, and September 1, 2016.

The Circuit Court rejected the State's argument that exigent circumstances justified the search because the State failed to establish that there was probable cause that a crime was being committed. The court further held that Sergeant Cobb coerced Lee into opening the door. The Circuit Court made, amongst others, the following COL that are contested by the State:

---

[4](...continued)
  (a)  Intentionally or knowingly causes bodily injury to a law enforcement officer who is engaged in the performance of duty; or

  (b)  Recklessly or negligently causes, with a dangerous instrument, bodily injury to a law enforcement officer who is engaged in the performance of duty.

[5]  HRS § 710-1026 provides, in relevant part:

  **Resisting arrest.** (1) A person commits the offense of resisting arrest if the person intentionally prevents a law enforcement officer acting under color of the law enforcement officer's official authority from effecting an arrest by:

    (a)  Using or threatening to use physical force against the law enforcement officer or another; or

    (b)  Using any other means creating a substantial risk of causing bodily injury to the law enforcement officer or another.

7

9. The State's assertion that there were exigent circumstances and that police could enter Defendant's bedroom without a warrant is without merit because the exigent circumstances exception to the warrant requirement mandates that the police must have probable cause that a crime was or is being committed. State v. Kapoi, 64 Haw. 130, 141, 637 P.2d 1105, 1114 (1981) (citing Coolidge v. New Hampshire, 403 U.S. 443, 461-62 (1971).

10. While police responding to a suicide call could be considered exigent circumstances, in the instant case Defendant was communicating with officers through his bedroom door for at least 20 minutes. He was in his room for at least 10 minutes prior to Corporal Takahashi and Officer Kahao's arrival. Defendant did not sound hurt, injured or in distress. Defendant repeatedly told the officers that he was okay and he did not want to talk to them. In response to Officer Kahao's statement, that "she just wanted to see that he was okay," Defendant told Officer Kahao he was not hurt and he wanted to them to leave. All of the officers testified that if they believed that Defendant was actually harming himself in his bedroom, they would have broken down the bedroom door.

11. Whether or not there was an exigency is independent from the requirement that the police must also have probable cause that a crime was or is being committed. In the instant case, the police did not have probable cause that a crime was being committed. Sergeant Cobb testified that committing suicide and attempting to commit suicide are not criminal offenses. All of the officers testified that there was no indication that criminal activity was occurring inside of Defendant's bedroom. When the bedroom door opened, the officers did not observe any illegal activity occurring inside the bedroom prior to entering.

12. There was no probable cause Defendant was engaging in criminal conduct in the bedroom. Thus, exigent circumstances did not exist.

13. The State's argument that Defendant or his family consented to the entry into Defendant's bedroom is without merit because Defendant's mother, Linda, and brother, Gavan, did not have authority to consent to the police entering Defendant's bedroom and Defendant's consent was not freely and voluntarily given.

14. Defendant had an actual, subjective expectation of privacy in his bedroom. That expectation is one that society would recognize as objectively reasonable. Thus, even though Linda and Gavan may have consented to entry into the residence at 98-569 Aloalii Street, neither Linda, nor Gavan could have consented to the police entering Defendant's bedroom. It is clear that Defendant did not want the officers to enter his bedroom. Defendant did not open his door for at least 30 minutes. He repeatedly told the officers to leave. Defendant asked the police if they had a warrant and once Sergeant Cobb unlocked the bedroom door from the outside, Defendant blocked the door to prevent Sergeant Cobb from entering his bedroom.

. . . .

21.	The State's argument that the "plain view" doctrine is applicable in this case is without merit because there was no prior lawful justification for the intrusion into Defendant's bedroom.

. . . .

23.	There was no justification for the intrusion into Defendant's bedroom. There were no exigent circumstances to justify the intrusion and Defendant did not freely and voluntarily consent to the intrusion. See COL 12 and 19. "Without prior justification for their presence, police officers may not enter constitutionally protected premises in order to seize evidence in plain view." Meyer, 78 Hawai'i at 317, 893 P .2d at 168.

24.	There was no probable cause to believe that there was evidence of a crime or contraband in Defendant's bedroom. It was not unlawful for Defendant to possess real or wooden samurai swords in his bedroom. None of the items observed in Defendant's bedroom before or after the unlawful intrusion were contraband.

25.	Once officers unlawfully stepped into Defendant's bedroom, any subsequent criminal activity that officers may have observed cannot fall into the plain view exception to the warrant requirement because they did not observe the activity and/or evidence from a position they were lawfully permitted to be in.

The Circuit Court suppressed "all statements, evidence, observations and actions that were observed or obtained after the unlawful entrance into Defendant's bedroom, and all the fruits thereof is hereby suppressed and precluded from use at trial."

This appeal followed.

## II.

The State raises a single point on appeal, that the Circuit Court erred in suppressing evidence stemming from the police entry into Lee's bedroom without a warrant where exigency existed under the circumstances of this case.

## III.

### A.	Motion to Suppress

We review questions of constitutional law de novo, under the right/wrong standard. State v. Hauge, 103 Hawai'i 38, 47, 79 P.3d 131, 140 (2003). "Accordingly, '[w]e review the circuit court's ruling on a motion to suppress de novo . . .'" Id. (quoting State v. Locquiao, 100 Hawai'i 195, 203, 58 P.3d 1242, 1250 (2002)).

State v. Phillips, 138 Hawai'i 321, 357, 382 P.3d 133, 169 (2016).

B.    **Pretrial FOF and COL**

>    Appellate courts review a circuit court's pretrial findings of fact under the clearly erroneous standard. <u>State v. Naititi</u>, 104 Hawai'i 224, 233, 87 P.3d 893, 902 (2004) (citing []<u>Locquiao</u>, 100 Hawai'i [at] 203, 58 P.3d [at] 1250 (2002)).  "A finding of fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made." <u>Id.</u> (internal citation omitted).  Substantial evidence is "credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." <u>State v. Richie</u>, 88 Hawai'i 19, 33, 960 P.2d 1227, 1241 (1998) (citation and internal quotation mark omitted).

>    Pretrial conclusions of law are reviewed under the de novo standard. <u>Naititi</u>, 104 Hawai'i at 233, 87 P.3d at 902; <u>see</u> <u>State v. Kauhi</u>, 86 Hawai'i 195, 197, 948 P.2d 1036, 1038 (1997) ("We review the circuit court's ruling on a motion to suppress de novo to determine whether the ruling was 'right' or 'wrong'").  "A conclusion of law that is supported by the trial court's findings of fact and that reflects an application of the correct rule of law will not be overturned." <u>Dan v. State</u>, 76 Hawai'i 423, 428, 879 P.2d 528, 533 (1994) (citation and internal quotation marks omitted).

<u>State v. Ramos-Saunders</u>, 135 Hawai'i 299, 302, 349 P.3d 406, 409 (App. 2015) (brackets added).


## IV. DISCUSSION

A.    **The Circuit Court Erred in Granting Lee's Motion to Suppress Because Officers Acted Under the Emergency Aid Exception to the Warrant Requirement**

        The State contends that the Circuit Court erred in granting Lee's motion to suppress evidence and statement. Specifically, the State argues officers had sufficient exigent circumstances to enter Lee's room because of the need to render emergency aid because Lee was suicidal.  In the alternative, the State contends that even if the police entry into Lee's room was unlawful, the evidence of crimes against officers should not have been excluded.

    1.    **Hawai'i Supreme Court Law on Warrantless Searches in the Home**

        It is well established in this jurisdiction that warrantless searches are unreasonable unless they fall within one of the specifically established and well-delineated exceptions. <u>E.g.</u> <u>State v. Jenkins</u>, 62 Haw. 660, 662, 619 P.2d 108, 110

10

(1980). The established exceptions to the warrant requirement in Hawai'i are: when there is probable cause and exigent circumstances, probationary status, consensual searches, preincarceration searches, open view, "automobile exception[,]" stop and frisk, and plain view. See State v. Meyer, 78 Hawai'i 308, 312, 893 P.2d 159, 163 (1995). "Because of the special privacy interest in the home, '[i]t is now settled that any warrantless entrance of a private dwelling by the police can only be justified under the 'exigent circumstances' exception[] to the warrant requirement of the Fourth Amendment[.]'" State v. Line, 121 Hawai'i 74, 85, 214 P.3d 613, 624 (2009) (citation and internal quotation marks omitted). The exigent circumstances exception arises where the investigating officer has probable cause and exigent circumstances to justify a search or seizure. E.g. Jenkins, 62 Haw. at 662, 619 P.2d at 110. Probable cause exists

> where "the facts and circumstances within their (the officers) knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed.

State v. Agnasan, 62 Haw. 252, 255-56, 614 P.2d 393, 396 (1980) (quoting Brinegar v. United States, 338 U.S. 160, 175-76 (1949)). Exigent circumstances must be determined on a case by case basis. Jenkins, 62 Haw. at 662, 619 P.2d at 110. It is the government which bears the burden of proving a warrantless search to be reasonable, a task it may accomplish by showing that "the facts of the case justified the police in searching without a warrant and that the search itself was no broader than necessary to satisfy the need which legitimized departure from the warrant requirement in the first place." State v. Kaluna, 55 Haw. 361, 363, 520 P.2d 51, 55 (1974) (citing Cupp v. Murphy, 412 U.S. 291, 295 (1973) (citations and quotes omitted)).

2. **The Circuit Court's Decision Turned on a Lack of Probable Cause**

In this case, the Circuit Court determined officers searched Lee's room without a warrant, and that the exceptions of exigent circumstances, consent, and plain view did not apply. Regarding exigent circumstances, applying precedent the court

11

specifically held the exception did not apply because there was no probable cause to believe Lee was engaged in criminal conduct. See Jenkins, 62 Haw. at 662, 619 P.2d at 110. Therefore, the Circuit Court did not determine whether or not an exigency existed. On appeal, citing federal and out-of-state case law, the State argues that the existence of probable cause was irrelevant because the potential for Lee's suicide created exigency such that the officers needed to enter to provide emergency aid. Lee responds by citing the greater protections for privacy under the Hawai'i Constitution and factually distinguishing the cases on which the State relies. E.g., State v. Endo, 83 Hawai'i 87, 93, 924 P.2d 581, 583 (App. 1996) (citation omitted) (unlike the federal constitution the Hawai'i constitution specifically provides against invasions of privacy).

3.    **The Emergency Aid Exception to the Warrant Requirement Has Been Recognized in Hawai'i**

Subsequent to the Circuit Court's decision in this case, in State v. Wilson, 141 Hawai'i 385, 392, 410 P.3d 865, 872 (App. 2017), this court recognized an emergency aid exception to the warrant requirement under Article I, Section 7 of the Hawai'i Constitution. We adopted the United States Supreme Court's reasoning which recognized an emergency aid exception to the warrant requirement of the Fourth Amendment to the federal constitution set forth in Brigham City v. Stuart, 547 U.S. 398, 403 (2006). Id. In Brigham City, the Supreme Court held "law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." 547 U.S. at 403.

> "This 'emergency aid exception' does not depend on the officers' subjective intent or the seriousness of any crime they are investigating when the emergency arises." [Michigan v. Fisher, 558 U.S. 45, 47 (2009)]. Rather, the test is an objective one that focuses on whether law enforcement officers had "'an objectively reasonable basis for believing' that medical assistance was needed, or persons were in danger." Id. at 49 (citation omitted).

Wilson, 141 Hawai'i at 393, 410 P.3d at 873 (brackets added).

In <u>Wilson</u>, we concluded the officer's warrantless entry was justified, without respect to the existence of probable cause, because he had an objectively reasonable basis for believing a woman was in need of emergency aid. 141 Hawai'i at 393, 410 P.3d at 873.[6] Here, without the benefit of <u>Wilson</u>, the Circuit Court granted Lee's motion on the basis that the exigent circumstances exception could not apply because there was no probable cause that a crime was being committed. Therefore, the issue is whether under the totality of the circumstances presented there was an objectively reasonable basis for the officers to believe that Lee was in need of emergency aid when the officers conducted the warrantless search.

### 4. The Warrantless Search Occurred When Lee Opened the Bedroom Door

As an initial point, the Circuit Court's order does not clearly identify when the warrantless search took place. Reviewing the Order and the hearings, there are two points in time when officers could be deemed to have conducted a search: (1) when Sergeant Cobb talked Lee into opening his bedroom door;[7] or (2) when the officers physically entered Lee's room to neutralize the perceived threat from Lee's wooden samurai sword, described above.[8] We will analyze both.

In <u>Phillips</u>, the Hawai'i Supreme Court recognized changes in federal constitutional jurisprudence under the Fourth Amendment and Hawai'i Constitution. 138 Hawai'i at 337, 382 P.3d at 149. The court now requires two different tests: "(1) the

---

[6]     In <u>Wilson</u>, we noted the defendant did not argue whether there was probable cause to search his residence. <u>Id.</u> at 392 n.6, 410 P.3d at 872 n.6. However, we joined other jurisdictions that have recognized the existence of the emergency aid exception to the Fourth Amendment "when they reasonably believe that a person within is in need of immediate aid." <u>Id.</u> at 392-93, 410 P.3d at 872-73 (quoting <u>Mincey v. Arizona</u>, 437 U.S. 385, 392 (1978)); <u>see also</u> <u>Sutterfield v. City of Milwaukee</u>, 751, F.3d 542, 564 (7th Cir. 2014) ("[I]n emergency aid cases, where the police are acting to protect someone from imminent harm, there frequently is no suspicion of wrongdoing at the moment that the police take action.").

[7]     Although Sergeant Cobb first unlocked the door, because he did not open the door without Lee's assistance, we analyze these two events together.

[8]     The Circuit Court's order does not make this distinction, referring to the officers' "entering the Defendant's bedroom" to mean both coercing Lee into opening the door and the officers physically entering into the bedroom.

'[(Katz v. United States, 389 U.S. 347, 351 (1967))] reasonable expectation of privacy test,' State v. Kender, 60 Haw. 301, 303, 588 P.2d 447, 449 (1978), and (2) the Jones/Jardines trespass-intrusion test, Florida v. Jardines, [569] U.S. [1] (2013); United States v. Jones, [565] U.S. [400] (2012)." Id. at 336-37, 382 P.3d at 148-49 (brackets added). "The Katz doctrine provides that only government intrusions into areas, objects, or activities in which an individual has exhibited a 'reasonable expectation of privacy' are searches subject to the protections of the Fourth Amendment." Id. at 337, 382 P.3d at 149 (citing Katz, 389 U.S. at 360). Under Katz, to determine whether a person's expectation of privacy is reasonable, a person must exhibit an actual (subjective) expectation of privacy, and that expectation must be one that society is prepared to recognize as objectively reasonable. Id.

Here, we agree with the Circuit Court's conclusion that Lee showed a subjective expectation of privacy in his bedroom by denying his family access and initially refusing to open the door for police. Further, in State v. Vinuya, this court held a resident adult child has an objectively reasonable expectation of privacy in the bedroom kept in a parent's home. 96 Hawai'i 472, 482, 32 P.3d 116, 126 (App. 2001). Thus, the search occurred for constitutional purposes when, at the insistence of the police, "[Lee] opened his bedroom door approximately four to six inches" because the government intruded into an area in which Lee had a reasonable expectation of privacy.[9] We need not address the Jones/Jardines trespass-intrusion test because we conclude a search occurred under Katz.

---

[9] The State challenges the part of FOF 23 as clearly erroneous, which states, "There was no information known to the officers before entering Defendant's bedroom that criminal activity was occurring within the bedroom." The State argues FOF 23 is in conflict with FOF 20, which states, inter alia, Lee was holding the wooden samurai sword after opening the door. Lee's threatening officers with the sword forms the basis for the terroristic threatening count. However, FOF 23 is not in conflict with FOF 20 unless the phrase "entering the Defendant's bedroom[,]" is read to mean when the officers physically entered the bedroom after they had already unlocked the door and convinced Lee to open the door. We read the phrase to refer to the opening of the door and not the physical entry and therefore see no conflict between the FOF. Thus, FOF 23 is not clearly erroneous.

### 5. Police Had An Objectively Reasonable Basis for a Search to Render Aid

With regard to the opening of Lee's bedroom door, we evaluate the totality of circumstances that existed at that time to determine whether officers had an objectively reasonable basis to believe Lee was in need of emergency aid. Wilson, 141 Hawai'i at 393, 410 P.3d at 873. In Wilson, the officer had an objectively reasonable basis for believing a woman had been stabbed, injured, restrained, or was otherwise in critical need of assistance because the 911 call reported domestic abuse involving a man brandishing a knife, police located and detained the man at his house, police did not locate the woman but heard a woman's cries from within the house, and the officer entered the house only after his calls of "police . . . where are you?" went unanswered. Id. at 387, 393, 410 P.3d at 867, 873.

Other jurisdictions have held credible threats of suicide provide a basis for invoking the emergency aid exception to the warrant requirement. See, e.g., Sutterfield v. City of Milwaukee, 751, F.3d 542 (7th Cir. 2014); Rice v. ReliaStar Life Ins. Co., 770 F.3d 1122 (5th Cir. 2014) (no Fourth Amendment violation where officers entered house in attempt to prevent suicide); United States v. Timmann, 741 F.3d 1170, 1180 (11th Cir. 2013) (discussing Roberts v. Spielman, 643 F.3d 899, 902 (11th Cir. 2011) (warrantless entry justified on sister-in-law's report of possible suicide based on prior attempts, bipolar disorder, presence of vehicle, televisions on, and no answer at door)); United States v. Uscanga-Ramirez, 475 F.3d 1024 (8th Cir. 2007) (warrantless entry into locked bedroom justified by potential for suicide where wife told officers husband was not suicidal but was armed with gun and distraught over end of marriage); Seibert v. State, 923 So.2d 460, 467-68 (Fla. 2006) (officers' forced entry justified by roommate report of suicidal threat with large kitchen knife nearby); cf. Bailey v. Kennedy, 349 F.3d 731, 740 (4th Cir. 2003) (third-party 911 report that plaintiff was attempting suicide "[w]ithout more" could not

support probable cause[10] sufficient to justify warrantless entry and arrest for emergency medical evaluation).

In Sutterfield, police took over eight hours to find Sutterfield after her psychiatrist reported her leaving an appointment having voiced suicidal thoughts. 751 F.3d at 545-46. Officers began a search for Sutterfield pursuant to a state statute[11] which authorized taking a person into custody when there is "cause to believe that the person is mentally ill and evidences '[a] substantial probability of physical harm to himself or herself as manifested by evidence of recent threats of or attempts at suicide or serious bodily harm.'" 751 F.3d at 546. Despite a subsequent call by the doctor relaying Sutterfield's message that she was not in need of assistance and the doctor should "call off" the police search, officers knocked on Sutterfield's front door. 751 F.3d at 545-46. About a half-hour later, when attempts to convince Sutterfield to allow them into her house had failed, and after Sutterfield had opened the inner door to her house but not the locked outer storm door, the police yanked the door open and a struggle ensued, resulting in her being handcuffed and taken into custody. 751 F.3d at 547. A protective sweep of her kitchen resulted in the discovery of, among other things, a semi-automatic handgun bearing a yellow "smiley-face" sticker on the barrel. Id.

In an extensive, thoughtful decision on the subject of police action upon a report of a possible suicide, the United States Court of Appeals for the Seventh Circuit analyzed this case, inter alia, under the emergency aid doctrine and noted,

> As in [Fitzgerald v. Santoro, 707 F.3d 725 (7th Cir. 2013)], the officers in this case had objectively reasonable grounds on which to believe that Sutterfield might harm herself. The police had been advised by Sutterfield's physician that she had threatened to take her own life. Based on that report, they had completed a statement of emergency detention that authorized officers to take Sutterfield into custody for a mental health evaluation. When officers arrived at Sutterfield's home that evening and tried to talk to her, she would not allow them into her

---

[10]    Some jurisdictions' case law predating Brigham City fit the need to enter to provide aid within a probable cause determination that a person is in danger. See generally Roberts, 643 F.3d at 905 (discussing United States v. Holloway, 290 F.3d 1331, 1334 (11th Cir. 2002)).

[11]    Wisconsin Statutes section 51.15.

home. Sutterfield contends that she was not acting "erratically," as the district court put it, but simply wished to be left alone. Perhaps so. But the relevant point, for our purposes, is that nothing transpired at the front door of her home that might have put the police on notice that the emergency that had been reported by Sutterfield's physician, and which was the basis for the section 51.15 statement of emergency detention, had dissipated. It was objectively reasonable for police on the scene to believe that the danger to Sutterfield's well-being was ongoing and that, in the absence of Sutterfield's cooperation, they needed to enter the home forcibly, as they did.

To say, as Sutterfield does, that given the passage of time and her own assurances to the officers that she was fine, that there was no longer any emergency, and that the officers should have heeded her demands that they leave, is to engage in the very sort of second-guessing that we eschewed in Fitzgerald. How were the officers to know that Sutterfield was competent to assess the state of her own mental health or that, regardless of what she herself said, there was no longer any risk that she might harm herself? Only a medical professional could make that judgment, and the officers had prepared and were executing a section 51.15 statement for the very purpose of having her evaluated by such a professional.

751 F.3d at 561-62.

The Sutterfield court went on to address head-on the passage of several hours between first report and entry:

[I]t is a reasonable and important question how long the police may claim that a putative emergency justifies warrantless action. . . . [I]t would be folly for us to try to declare ex ante some arbitrary cut-off that would apply to all emergency aid cases. Even in this case, it is not at all clear to us, nor would it have been to the police, that the mere passage of time without apparent incident was sufficient to alleviate any concern that Sutterfield might yet harm herself[,] . . . [a]nd the parties have given us no information about how long a threat of suicide could be thought to impose an imminent danger of harm to the person who made it; certainly nothing in this record suggests that such a threat necessarily diminishes with the passage of a few hours or with the suicidal individual's assurances that she is fine.

751 F.3d at 562-63.

Moreover, the court posited that there was no warrant available, or arguably even applicable, under the circumstances:

But a more fundamental question raised by this case is the relevance of the warrant requirement. . . . [I]n emergency aid cases, where the police are acting to protect someone from imminent harm, there frequently is no suspicion of wrongdoing at the moment that the police take action. Even in a case like Brigham City, for example, where there actually were signs of criminal activity (juveniles drinking beer in the backyard, and people fighting inside of the house), and the occupants of the house ultimately were arrested and charged with criminal

offenses, the relevant point vis-a-vis the warrantless entry was that immediate action was required in order to protect someone from harm. Brigham City thus articulated the justification for the entry not in terms of reason to believe that any crime was taking place, or that evidence was about to be destroyed, but rather as reason to believe that an occupant of the home needed their assistance. 547 U.S. at 403, 406, 126 S.Ct. at 1947, 1949. It may be, then, that probable cause in the emergency aid context is not reason to believe a crime is occurring or has been committed, but reason to believe that someone is in need of aid and there is a compelling need to act. This framing of the inquiry suggests that whether there was time to seek a warrant loses its relevance in the emergency aid subset of exigency cases. The passage of time may remain relevant as a measure of whether there was a true emergency justifying the intrusion into someone's home, but not in terms of whether a warrant could have been sought.

Reinforcing that point in this case is the unanswered question as to what type of warrant would have been available to the police, given that Sutterfield was not suspected of any crime. . . .

. . . .

To be clear then, what Sutterfield is arguing for is the creation of a particular type of warrant that does not currently exist.

751 F.3d at 564 (some citations omitted); see also, State v. Jenkins, 93 Hawai'i 87, 101 n.9, 997 P.2d 13, 27 n.9 (2000) (traffic stop not for "investigatory purpose", therefore analysis under Terry v. Ohio, 392 U.S. 1 (1968) unnecessary).

Here, reviewing the Circuit Court's Order and the record in light of the foregoing authority, we conclude there were circumstances that objectively support the officers' insistence that Lee open his bedroom door. The officers responded to a 911 report of a suicidal male; dispatch informed the officers that Lee was locked in his room with samurai swords; Lee's mother, who was on the scene, informed Sergeant Cobb that Lee had previously attempted suicide by cutting himself;[12] and Sergeant Cobb and Corporal Takahashi testified police procedure for a suicide call requires both a physical and mental evaluation

---

[12] Although he has not appealed from the Circuit Court's decision, Lee argues FOF 15 is clearly erroneous because evidence of Linda's statement was admitted for the limited purpose of Sergeant Cobb's state of mind and subsequent actions. This is exactly the purpose for which Linda's statements were used. This information came from a person who was in a position to know of Lee's prior suicide attempt and, without more, Sergeant Cobb could reasonably rely on this information in taking action. The Circuit Court's decision does not depend on whether this information was true.

of the subject person to ensure he is no longer a threat to himself.

Other facts found by the Circuit Court are at best neutral: That Lee repeatedly made statements to the effect of "I'm okay. I just don't want to talk to you," and "I'm not hurt, just leave[,]" was not inconsistent with an intent to commit suicide. That Lee's demeanor was calm towards the officers through the door; that they did not hear sounds of distress or other indications that Lee was actually harming himself; and they would have broken down the door if they thought so did not eliminate the reasonable possibility Lee was still actively intending to kill or harm himself.

We conclude under the totality of circumstances that the officers had an objectively reasonable basis for insisting that Lee open his bedroom door because of the potential for "imminent injury" as identified in the Brigham City analysis. Accord Sutterfield, 751 F.3d at 567 ("the circumstances generally meet the criteria for a warantless entry . . . in that it was objectively reasonable for the officers to believe that their intervention was required in order to prevent Sutterfield from harming herself, notwithstanding her own protestations to the contrary.").

Nor was the warrantless search "broader than necessary to satisfy the need which legitimized departure from the warrant requirement in the first place." Kaluna, 55 Haw. at 363, 520 P.2d at 55. The officers acted in order to ensure that Lee was not a danger to himself. Both Sergeant Cobb and Corporal Takahashi stated that officers must make a physical and mental evaluation of a suicidal person. Specifically, Corporal Takahashi detailed that officers must consult a police psychologist to determine whether to take a suicidal person to the hospital to get mental health treatment.

This policy is consistent with police statutory duties and powers. Under HRS § 334-59(a)(1) (Supp. 2017),[13] law enforcement officers "shall" consult mental health emergency workers where the officer "has reason to believe that a person is imminently dangerous to self or others[.]" Further, that section gives officers discretion to take a suicidal person into custody. Id.; see also HRS § 703-308 (2014) (authorizing the use of force to prevent another person from committing suicide or inflicting serious bodily harm on him or herself). Therefore, under the facts of this case, the officers were reasonably seeking to conduct an inquiry to enable them to evaluate Lee physically and mentally and if necessary take Lee into custody. Exactly what occurred after Lee opened the door is the subject of the underlying charges and conflicting testimony. However, it is clear on this record that the officers had not yet completed the investigation necessary to ensure that Lee no longer posed a danger to himself before they entered the bedroom and the situation escalated. Therefore, insisting that Lee open his bedroom door was no broader than necessary to reasonably enable the officers to fulfill their responsibilities.

Lee makes the counter-argument that the officers' actions evince a "lack of urgency" because Corporal Takahashi waited for Officer Kahao to arrive and officers spoke to Lee for over 20 minutes before opening the door. However, that the

---

[13]   HRS § 334-59 provides, in relevant part:

**Emergency examination and hospitalization.** (a) Initiation of proceedings. An emergency admission may be initiated as follows:

(1)   If a law enforcement officer has reason to believe that a person is imminently dangerous to self or others, the officer shall call for assistance from the mental health emergency workers designated by the director. Upon determination by the mental health emergency workers that the person is imminently dangerous to self or others, the person shall be transported by ambulance or other suitable means, to a licensed psychiatric facility for further evaluation and possible emergency hospitalization. A law enforcement officer may also take into custody and transport to any facility designated by the director any person threatening or attempting suicide.

20

officers chose to "talk down" Lee rather than immediately break into his room, does not take away from their need to ascertain whether the threat of suicide had passed.

Lee also argues that any exigency was caused by Sergeant Cobb's aggressive behavior, and, thus, should not be recognized under the "police-created exigency" doctrine, citing Kentucky v. King, 563 U.S. 452, 452-53 (2011). Here, similar to King, "the police did not create the exigency by engaging or threatening to engage in conduct that violates the Fourth Amendment." 563 U.S. at 462. Cobb testified that after Lee cracked the door open, it appeared Lee was trying to hide an object behind the door and Cobb believed he saw a handle of possibly a sword. Cobb testified he pushed the door open "for our safety, and fearing that he might actually have a samurai sword in his hand". Officer Kahao testified that, although she recognized that Lee was holding a wooden sword, Lee was holding it up by his chest "in a manner as where he would have used it to strike, say, anyone who entered the bedroom" and that Lee had not lowered the wooden sword when Cobb pushed the door open. Corporal Takahashi testified that he saw a wooden stick raised up at a ninety degree angle in Lee's hand. Thus, the exigency, i.e., the danger Lee presented to himself as well as the officers, given his aggressive stance with the wooden sword, existed before Sergeant Cobb pushed into the room. Police are allowed to take limited action to protect officer safety. See, Sutterfield, 751 F3d. at 566 ("Given our conclusion that the forced entry was reasonable, the [protective] sweep . . . was also reasonable[.]"). In short, we recognize that police conduct cannot create the exigency justifying a search, but given the totality of the circumstances that did not occur here. Therefore, Lee's counter-arguments are without merit.

Based on the foregoing, we hold that under the totality of the circumstances, officers had an objectively reasonable basis to believe that Lee was in need of aid from the danger

posed by his threat of suicide, and, therefore, the Circuit Court erred by granting his motion to suppress.

## V. CONCLUSION

For these reasons, we vacate the Circuit Court of the First Circuit's October 13, 2016 Findings of Fact and Conclusions of Law and Order Granting Defendant's Motion to Suppress Evidence and Statements, and remand for further proceedings.

DATED:  Honolulu, Hawai'i, May 31, 2019.

On the briefs:

Stephen K. Tsushima,
Deputy Prosecuting Attorney,
City and County of Honolulu,
for Plaintiff-Appellant.

Alen M. Kaneshiro,
for Defendant-Appellee.

Chief Judge

Associate Judge

Associate Judge

22